UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

FRANKLIN GIBBS,

     Plaintiff,

  -against-

UNITED STATES TRUST COMPANY OF NEW
YORK, U.S. TRUST TECHNOLOGY AND
SUPPORT SERVICES, INC., and MATT STAVSKY,

     Defendants.

------------------------------------------------------------------X

05 Civ. 6498 (LAP) (HP)

**AMENDED COMPLAINT**

   Plaintiff, FRANKLIN GIBBS ("Plaintiff" or "GIBBS"), by and through his attorneys, LAW OFFICE OF VINCENT I. EKE-NWEKE, P.C., as for his Amended Complaint (pursuant to leave granted by the endorsed order of the court dated January 19, 2006), complains of Defendants UNITED STATES TRUST COMPANY OF NEW YORK, U.S. TRUST TECHNOLOGY AND SUPPORT SERVICES, INC. (both "U.S. TRUST") and MATT STAVSKY ("STAVSKY") (collectively "Defendants"), upon information and belief, as follows:

## I. NATURE OF THE ACTION

   1.  Plaintiff brings this action to remedy discrimination on the basis of race in the terms, conditions, and privileges of employment in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"), the New York State Human Rights Law, Executive Law § 269 *et seq.* ("Human Rights Law"), the New York City Civil Rights Law ("City Law") and New Jersey Law Against Discrimination NJSA 10:5-12 *et seq.* ("LAD"). In addition, Plaintiff claims that, in violation of those laws, Defendants retaliated against him for having complained about Defendants' discriminatory acts toward him.

2.      Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, and other appropriate legal and equitable relief pursuant to Title VII, § 1981, Human Rights Law, City Law and LAD.

## II.  JURISDICTION AND VENUE

3.      Jurisdiction of the subject matter of this action is established in this court by Title VII and § 1981.

4.      All causes of action not relying exclusively on the aforementioned federal causes of action as a basis of this court's jurisdiction, are based on the court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367, to hear related state law causes of action.  The events, parties, transactions, and injuries that form the basis of Plaintiff's federal claim are identical to the events, parties, transactions, and injuries that form the basis of Plaintiff's claims brought under the Human Rights Law, City Law and LAD.

5.      As part the unlawful employment practices complained of herein occurred within the Southern District of New York and Defendants regularly do business within this District, venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

## III.  SATISFACTION OF PROCEDURAL PREREQUISITES FOR SUIT

6.      Plaintiff has complied with all procedural prerequisites required by law.

7.      On or about October 18, 2005, Plaintiff caused a charge of discrimination to be filed against the U.S. TRUST with the Equal Employment Opportunity Commission ("EEOC"). The charge was timely filed under Title VII.

8.      By Notice of Suit Rights dated November 15, 2005, the EEOC advised Plaintiff of his right to sue on the charge.  Plaintiff's claim pursuant to Title VII was timely commenced within 90 days of Plaintiff's receipt of said Notice.

## IV.  **THE PARTIES**

9.      Plaintiff is an African American male.  At all relevant times Plaintiff was resident within the City and State of New York, and has been employed for more than 18 years by U.S. TRUST.

10.     Defendants UNITED STATES TRUST COMPANY OF NEW YORK and U.S. TRUST TECHNOLOGY AND SUPPORT SERVICES, INC., are corporations organized and existing under the laws of the State of New York, and have their principal office and place of business located in Manhattan, New York. U.S. TRUST is engaged in the business of investment and wealth management and has more than 2,300 employees.

11.     U.S. TRUST'S Personnel Department (where some of the discriminatory employment decisions affecting Plaintiff and other employees are made or approved) is located in Manhattan, New York.

12.     During all times herein mentioned, STAVSKY, a Caucasian Male, was and still is an adult person and an employee, servant, agent, representative and/or a Managing Director assigned to U.S.TRUST'S Computer Services Division.  STAVSKY is an employer within the meaning of § 1981, the Human Rights Law, the City Law and the LAD and is subject to the said statutes.

13.     U.S. TRUST is an employer within the meaning of Title VII, § 1981, Human Rights Law, City Law and the LAD.  Defendants were in virtue of the aforementioned laws, prohibited from discriminating in employment decisions on the basis of race. Plaintiff was in virtue of said laws protected against discrimination in employment on the basis of race, in that Plaintiff is Black -- a protected and recognized minority category.

3

## V. FACTUAL ALLEGATIONS

14.     Plaintiff has been employed by U.S.TRUST for more than 18 years and has been stagnated at the same Reporting Level throughout his tenure with U.S. TRUST, given disproportionately low salary increases and bonuses, while similarly situated and/or less qualified Caucasian and non Black employees have been promoted into senior management positions and given substantially higher amounts of salary increases and bonuses over the years.

15.     Plaintiff was employed by U.S. TRUST in February 1987, as a Project Manager in the Systems Development Department ("SDD") of U.S. TRUST'S Computer Services Division ("CSD"), then located in Manhattan, New York. In or about April 2000, following the relocation of U.S. TRUST'S CSD offices to 499 Washington Boulevard, Jersey City, New Jersey, Plaintiff and other employees assigned to CSD began to report to work at the aforementioned Jersey City, location.

16.     Prior to the time he began his employment with U.S. TRUST, Plaintiff possessed superior education and over ten years experience in data processing and advanced management skills. Specifically, Plaintiff obtained an MBA degree in Information Systems in 1981, from Pace University, New York, New York. No other employee in U.S. TRUST'S CSD possesses such graduate educational qualification. Furthermore, Plaintiff had been employed in management positions at several Fortune 500 companies prior to his employment with U.S. TRUST.

17.     Plaintiff was and still is believed by U.S. TRUST, his supervisors, co-workers and others to be a model employee, having been given awards and glowing commendations by U.S. TRUST and having been recognized for his excellent work, helpful attitude, dedication and positive influence on other employees, and entities associated with U.S. TRUST.

18.   As demonstrated by the glowing comments contained in the job performance evaluations issued to Plaintiff over the years, Plaintiff's job performance throughout the more than 18 years of his employment with U.S. TRUST has consistently been excellent. For instance:

a.   In 1988, in what appears to be the first performance evaluation of Plaintiff, his supervisors or managers stated variously as follows: "Mr. Gibbs joined the Trust Company as a Project Manager one year ago and has continued in that capacity." "Mr. Gibbs has the desire and the intelligence for further advancement" "At U.S. Trust, after demonstrating that he could successfully support the General Ledger system, Franklin assumed responsibility for the Accounts Payable, Purchase Order, and Inventory Control systems".

b.   In 1990, Domenick Giammarco, who was then at Reporting Level 2 and Plaintiff's direct supervisor for about three years stated in part, "Franklin's excellent systems knowledge has allowed the rest of the support team to grow. Franklin is a good control manager who maintains a tight schedule for his staff as well as himself. He is very sensitive to user problems and responds quickly for their resolution."

c.   In 1991, Robert D. Zebro, another Reporting Level 2 supervisor of Plaintiff wrote, "Franklin, through technical expertise and applications knowledge, has successfully, and in a timely fashion, implemented all those enhancements requested during 1990. He has mastered the fundamentals of DB2, CSP and IMS". "Technical expertise and applications are knowledge are Franklin's strengths. He expends whatever energies are necessary to insure the successful fulfillment of his application responsibility"

d.   In 1992, Mr. Zebro stated that, "Franklin did an excellent job of improving user perception of systems in the General Accounting Department. He cleansed the Profit Sharing Database of numerous problems, completing its preparation for conversion to ERISCO, our outsourcing vendor."

e.   In 1993, Mr. Zebro, among other things stated that, "Franklin successfully converted the new release of AP/PO to production and developed log-on security for it. He successfully converted our profit sharing system to ERISCO and successfully completed all Sungard testing." Mr. Zebro further stated that "Franklin has exemplary administrative skills and keeps a tight reign on all projects he maintains for the difficult user areas of Human Resources and General Accounting."

f.    In 2001, Lillian Hoffman, then Senior Vice President who had been direct supervisor of Plaintiff for five years stated that during 2000, Plaintiff continued to be the main support of the Administrative Systems at U.S. Trust. He also designed and programmed an Access Interface to facilitate real estate transmissions to CDE. This freed user from dual manual input.

g.    In 2002, Anthony Kalian, then Plaintiff's direct supervisor stated that he met all his pre-established goals and performed well in 2001, especially with the transfer of the Administrative Systems to Mascot.

h.    In 2003, Plaintiff received an Overall Performance Rating of Highly Valued. His then supervisor, Steven Avolanti, partly commented that "Franklin's overall performance is at consistently high level. He is seasoned and gives assignment his best effort. He is highly valued." and that throughout 2002, "Franklin's responsibilities changed several times with outsourcing to India, New projects and new management. His openness to adapt to change and reinvent himself was key to the successful completion of the OAC project."

i.    In 2004, Gibbs' supervisor concluded with respect to his work performance in 2003 that, "Franklin has been a valuable asset to his business partners and U.S. Trust this year... Thank you Franklin for your hard work and support this year."

j.    In 2005, Gibbs received an Overall Rating of Distinguished for his work performance in 2004.

19.    Despite Plaintiff's superior qualification, excellent job performance, hard work and dedication to U.S. TRUST'S work, Defendants have intentionally discriminated against Plaintiff on the basis of Plaintiff's race and retaliated against him for his complaints against discrimination, among other things, by:

a.    subjecting Plaintiff to disparate treatment and favoring similarly situated and/or less qualified White and non Black employees for promotions, salary increases, bonus awards and work assignments;

b.    procuring unfair job performance evaluation for Plaintiff thereby significantly reducing the amounts of Plaintiff's bonuses, salary increases and expected pension or retirement benefits;

6

c.    disproportionately assigning large volume of work to Plaintiff to perform and setting unrealistic deadlines for Plaintiff;

d.    engaging in a course of conduct which includes, deprivation of job responsibility and/or career advancement opportunities, denial of job training opportunities, denial of promotion, salary increases/bonuses and undermining of Plaintiff's authority;

e.    exhibiting anti-Black bias, sentiment and racial stereotype.

20.    U.S. TRUST as a whole and its CSD follow a policy or practice that discriminates and/or has a discriminatory effect on Plaintiff and Black employees in general, on the basis of their race. Such discriminatory policy or practice has been and is being implemented by U.S. TRUST in its CSD in the following manner: by failing to establish, adopt, set or follow any objective standard or criteria in determining who to promote or hire into senior management positions, the amount of bonuses or salary increases to be awarded to management employees, and work assignment to management employees, by failing to properly advertise open positions, and by failing to promote or hire Black employees into senior management positions.

21.    As a result of such discriminatory policy or practice, the senior management of the CSD has over the years been made up of only Caucasian employees. However, after this lawsuit was already commenced, in or about January 2006, U.S. TRUST appointed Miriam Esteve, Hispanic, as the Executive Vice President/Chief Information Officer ("CIO") of the CSD, in place of Gerard Callaghan, Caucasian. Except for this change, as set forth below, the senior management and other officers of the CSD are mainly Caucasian employees:

a.   Six Managing Directors ("MD") all of whom are Caucasian, namely, Jeff Kostiw, Joseph Vito ("VITO"), STAVSKY, Steven Duvall, David Marx and Michael Sidell;

b.   Nine Senior Vice Presidents ("SVP") namely, Steve Avolanti ("AVOLANTI"), Scott Manville ("MANVILLE"), Mary Jane-Weeks, Sajid Syed ("SYED"), Alvin Lazarus[1] ("LAZARUS"), Samuel Rosenfeld, David Chin ("CHIN") and Joseph Demeo all Caucasian except for SYED and CHIN who are Asian;

c.   All Vice Presidents ("VP"), including, Francois Serrano, Sean Brennan, Gregory Larson ("LARSON"), Lourdes Perez, Veersha Shettaru, plaintiff, Gary Weinrib ("WEINRIB"), Chris Shaughnessy ("SHAUGHNESSY"), Ole Rose ("ROSE"), Alan Karvitz, Betty Bruhns, Gerard Lordo, Charles Hicks, are Caucasian, except for Plaintiff and Paul Croston ("CROSTON") who are Black, Edgar Roxas, Anastacio Puzon, Rodelio Odjar who are Asian and Maurice Alvarez and Paulo Silva who are Hispanic;

d.   There are no Black Assistant Vice Presidents ("AVP") or First Level Officers Computer Systems Officers ("CSO").

22.   Similarly, the senior management of the U.S. TRUST as a whole is predominantly Caucasian. Presently, there are no Blacks at the Presidential, Executive Vice President or Managing Director levels of the entire U.S. TRUST. There are only five (5) Black SVPs out of over three hundred fifty-four (354) SVPs firm wide. Also, Caucasian SVPs firm wide receive substantially higher salary increases, bonuses and are promoted more frequently than the few Black SVPs.

---

[1] Lazarus retired from U.S. Trust in December 2004, however; he was rehired as a consultant in January 2006.

23.    Beginning from June 1995, when U.S. TRUST terminated the employments of Henry Carney and Harry Elliott, who were then the only two Black employees that occupied senior management positions in CSD, the management of CSD became openly hostile to Black employees and Bernard Edelstein ("EDELSTEIN"), Caucasian, then CIO of the CSD, began to reduce Plaintiff's yearly bonus awards, salary increases and deny Plaintiff promotion.

24.    Over the years, Defendants have advanced the careers of CSD Caucasian employees who were less qualified than Plaintiff, or at best, similarly situated as Plaintiff, and paid such employees substantially higher salary increases and bonuses than Defendants paid to Plaintiff. Such employees include, Lazarus, Shaughnessy, Manville, Avolanti, Weinrib, Rose, Rosenfeld, Larson and Alan Kravitz.

25.    Defendants have not hired any Black programmers, analysts or managers in CSD since 1995.  Presently, Plaintiff and CROSTON (the other Black VP in CSD), are the most senior VPs in CSD.  Plaintiff was last promoted in March 1998, when he was promoted from AVP to VP. Similarly, CROSTON was last promoted in February 1995, when he was promoted from AVP to VP.

26.    However, in stark contrast to the stagnation of Plaintiff's career advancement, Defendants have advanced the respective careers of Lazarus, Manville, Avolanti, Shaughnessy, Rose, Larson, Weinrib, Chin, Gerald Lordo and Samuel Rosenfeld and promoted each of them several times over the years.

27.    Although plaintiff made several requests to be promoted, trained or afforded training opportunities, EDELSTEIN, STAVSKY and other senior managers of the CSD have failed to promote, train and/or afford Plaintiff any meaningful opportunity to be trained.

However, similarly situated and/or less qualified Caucasian employees have been afforded several opportunities to be trained and have been promoted two or three times over Plaintiff.

28.    For instance, in or about 1997, MARCIA FRIEND ("FRIEND"), a Caucasian former administrative secretary with limited data processing qualification or experience was promoted to the position of VP, SHAUGHNESSY who was then a Programmer Trainee was promoted to AVP and Peter Binetti, Caucasian, Analyst who did not possess the skills to function in the CSD was promoted to VP.  In addition, EDELSTEIN directed Plaintiff to report directly to FRIEND.

29.    When in 1997, Plaintiff complained to EDELSTEIN about the failure to promote him to VP, EDELSTEIN stated to Plaintiff that there are White employees in CSD who would not agree to report to a Black senior manager.

30.    As a result of the failure to promote plaintiff and other discriminatory treatment which Plaintiff was subjected to in the CSD, Plaintiff wrote a letter dated September 26, 1997, to Marshall Schwartz, then Chief Executive Officer of U.S. TRUST, wherein he complained about race discrimination. Following said letter, Plaintiff along with LAZARUS and SHAUGHNESSY were promoted to VP in March 1998.

31.    However, as a result of Plaintiff's complaint of discrimination, U.S. TRUST subtly began to retaliate against Plaintiff for making the complaint, among other things, by requiring Plaintiff to perform duties or errands usually performed by messengers (on several occasions Plaintiff was instructed to physically take computer cartridges from 770 Broadway, Manhattan, to Chase bank Data Center on Water Street, Manhattan, although there was a functional messenger service at 770 Broadway), by sabotaging Plaintiff's work and ability to meet deadlines, by directing Anthony Rodrigues, a consultant assigned to work for Plaintiff to

cease supporting the overnight flow and reassigning said consultant to work for LAZARUS, thereby over-working Plaintiff and saddling him with the entire suite Administrative Systems without any support staff.

32.    Also, in about 2000, Plaintiff was assigned the additional task to develop the Real Estate Interface System. As a result of the tremendous workload which Plaintiff was subjected to and the enormous pressure to meet deadlines, Plaintiff was practically working twenty-four hours daily, seldom had sufficient time to rest and as a result, was diagnosed with serious health complications.

33.    Plaintiff's then immediate supervisor, Lillian Hoffman ("HOFFMAN"), Caucasian, SVP who reported directly to STAVSKY, was frustrated with STAVSKY'S refusal to approve Plaintiff's requests for support staff.  HOFFMAN copied Plaintiff on an email dated September 28, 2000, which she sent to STAVSKY and stated in part: "Matt, Franklin has expressed (numerous times) a need for another resource to help him. I have asked him (as we did with [Lazarus] Al) to document his tasks."

34.    Despite several requests by Plaintiff, Defendants failed to assign any support staff to help Plaintiff with the Administrative Systems work, neither did Defendants reduce Plaintiff's excessive workload until when STAVSKY allowed Plaintiff to hire Adelia Clark as a Consultant.

35.    The work required to be performed in connection with the Administrative Systems, included, development, user problem resolution, responding to audits, overnight support, disaster recovery planning and execution, system maintenance, support of the online region, documentation of system changes, and stress testing. No Caucasian employee or manager in SDD and the entire CSD was subjected to such excessive workload.

36.     On the contrary, the workload assigned to similarly situated Caucasian managers was very light and insignificant. Thus, when in April 2001, each manager in CSD was required to submit a status report on the tasks he/she performed, STAVSKY directed Plaintiff to submit his report to FRIEND, so that FRIEND would merge or combine her report with Plaintiff's report to form one report.

37.     STAVSKY required Plaintiff and FRIEND to submit a joint status report in order to mask or suppress the fact that Plaintiff had an excessive workload and that FRIEND was under utilized. A joint or combined report would have created the misleading impression to Lisa Schreiber, then new CIO from Charles Schwab Corporation, that the excessive workload assigned to Plaintiff was performed by both Plaintiff and FRIEND.

38.     Plaintiff protested STAVSKY'S directive which required him and FRIEND to submit a combined status report and in connection therewith in or about 2001, Plaintiff filed a formal complaint with the Personnel Department of U.S. TRUST. Following Plaintiff's complaint, Plaintiff was allowed to hire CLARK to work with Plaintiff in the following assignments: Overnight support maintenance and enhancements, document and change management.

39.     Prior to her retirement in 2001, Plaintiff, LAZARUS and FRIEND all reported to HOFFMAN. In about July 2001, as part of his discriminatory scheme, STAVSKY allegedly created a new position of Oversight, Audits, Standards & Controls and reassigned HOFFMAN to be in charge of said position. As a result, Plaintiff, LAZARUS and FRIEND all ceased to report to HOFFMAN and began reporting directly to STAVSKY, allegedly, on a temporary basis.

40.     Following HOFFMAN'S reassignment, Plaintiff applied to STAVSKY for promotion to SVP. STAVSKY refused to promote and/or recommend Plaintiff for promotion, instead, STAVSKY asked Plaintiff: "Do you want me to take a chance on you?" "You are not from a group that has done well in management." Meaning that, Blacks do not do well in management.

41.     Rather than promote Plaintiff to SVP and assign him responsibility for the Corporate/Adminstrative Systems, on or about July 27, 2001 STAVSKY transferred responsibility for the Corporate/Administrative Systems to Anthony Kalian and reassigned Plaintiff to report directly to Kalian, who was then a Reporting Level 2 manager.

42.     On the other hand, LAZARUS continued to report directly to STAVSKY. On or about October 2, 2001 (approximately 3 months after Plaintiff and LAZARUS ceased to report to HOFFMAN), STAVSKY promoted LAZARUS from the position of VP to SVP and assigned responsibility for Banking Repatriation to LAZARUS.

43.     It is noteworthy that, LAZARUS and Plaintiff were both promoted from AVP to VP on the same date (March 1, 1998). Both of them were on the same Reporting Level and reported directly to HOFFMAN from about 1995 through July 2001.

44.     Some time in late 2001, when it became necessary for a manager from CSD to visit India, where part of U.S. TRUST'S programming and support functions were being outsourced, STAVSKY and MANVILLE selected LAZARUS to make the trip to India, although Plaintiff was the logical and most qualified person to go to India.

45.    Following Plaintiff's complaint to Robert Duste ("DUSTE"), Caucasian, then CIO for the CSD, STAVSKY and MANVILLE came up with some ridiculous reasons in an attempt to justify the decision to send LAZARUS to India. Among other things, by email dated February 28, 2002, MANVILLE stated that, "[e]xpectation of leadership from[Lazarus] Al", justified the selection of Lazarus for the Indian trip.

46.    STAVSKY and other top echelon CSD management personnel made it clear to Plaintiff that there was no "expectation of leadership" from Blacks in CSD.  They also, entrenched and/or fostered the notions in the CSD that Blacks do not do well in senior management positions, and that Caucasian employees in CSD would not agree to report to a Black senior manager.

47.    Thus, in about April 2002, when Plaintiff expressed concerns about STAVSKY'S attempt to have him report directly to SHAUGHNESSY, STAVSKY sent an email dated April 30, 2002, to Plaintiff and used the phrase, "other real-world constraints that we must live within" to articulate such racially stereotypical notion that Blacks do not do well in senior management.

48.    Such bigoted notions are in part fostered by the type of racial insensitivity blatantly exhibited by the senior management of the CSD in late 2000, when they played the confederate song "DIXIE" during a CSD planning session which was attended by Plaintiff and other Black employees in Manhattan, New York.

49.    Despite Plaintiff's concerns about being made to report to Shaughnessy, in about May 2002, STAVSKY reassigned Plaintiff to report to SHAUGHNESSY, who immediately began to give the new system users unrealistic deadlines without informing Plaintiff. SHAUGHNESSY instructed Surendra Rajendran, a developer assigned to work with Plaintiff not to do any work unless he or STAVSKY approved of the work.

50.     Requiring Plaintiff to report directly to SHAUGHNESSY was an affront and a discriminatory slap on Plaintiff's face. This is so because, in 1988 when Plaintiff was already a project manager, managing a group of staff and earning over $65,000 annually, Shaughnessy was a junior programmer making less than half the amount plaintiff was paid annually.   Also, Shaughnessy and Plaintiff were both promoted to the position of VP on the same date in 1998.

51.     In about May 2002, the major parts of the Administrative Systems, which were once single-handedly supported, developed and maintained by Plaintiff, were being supported by four persons.   STAVSKY unfairly removed these parts of the Administrative Systems from Plaintiff's management and reassigned most of the parts to LAZARUS and the rest to SHAUGHNESSY.   Interestingly, back in 2000, HOFFMAN had offered parts of the Administrative System to LAZARUS to maintain, but LAZARUS declined to maintain the system because there was no support staff working on the system at that time.

52.     Plaintiff complained to DUSTE, about the discriminatory treatment he was being subjected to in CSD, including but not limited to the unfair removal of the Administrative Systems from his management.   As a result of the complaint, in or about September 2002, responsibility for the Operating Accounts Control Systems ("OAC") was reassigned to Barbara Beck ("BECK"), Caucasian area manager, then in charge of the CSD's Web Development Department ("WDD"). Plaintiff was also, reassigned to WDD.

53.     However, in yet another discriminatory slap on the face, upon being reassigned to WDD, Plaintiff was unfairly made to report directly to AVOLANTI, instead of BECK who was then at Reporting Level 2. AVOLANTI began his employment with U.S. TRUST in 1988 as a Programmer Trainee. At the time, Plaintiff was a Project Manager and his annual salary was approximately two times the amount paid to AVOLANTI.

15

54.     In 1995, U.S. TRUST laid-off AVOLANTI and rehired him in 1998 in the position of a Sr. Programmer Analyst. At the time AVOLANTI was rehired, Plaintiff was already a VP and his annual salary was then about $16,000.00 higher than the annual salary paid to AVOLANTI upon being rehired. Presently, Plaintiff is still a VP, however, since his rehire, AVOLANTI has received three (3) promotions as follows: (a) to AVP in 1998, (b) to VP in 2000, and (c) to SVP 2004 and his annual salary has surpassed Plaintiff's.

55.     In or about February 2003, Defendants further discriminated and retaliated against Plaintiff for his complaint to DUSTE, by moving Plaintiff's office out of the CSD's office location at 499 Washington Boulevard, Jersey City, New Jersey, to a user area, which is located three buildings down the street from the premises housing CSD's offices.  Plaintiff is the only employee of the CSD whose office is at this location. As a result of the relocation, staff coordination, access and meetings with support personnel, managers and peers have become problematic for Plaintiff.

56.     In or about February 2003, the salary increase and bonus which Defendants awarded to Plaintiff for 2002 calendar year, were again substantially lower than the salary increases and bonuses Defendants awarded to CSD Caucasian employees similarly situated as Plaintiff.

57.     Following Plaintiff's complaint about the relatively low amounts of his salary increase and bonus, AVOLANTI informed Plaintiff that his salary increase and bonus were low because Plaintiff allegedly received a "Below Expectation" rating for the evaluation period ending December 31, 2002.

58.     Despite the fact that Plaintiff had successfully implemented the OAC in 2002, unbeknown to Plaintiff, STAVSKY discriminatorily procured a poor performance evaluation for Plaintiff for the said period and caused Plaintiff's performance to be rated "Below Expectation." In actual fact, Plaintiff did not perform below expectation during the period ending December 31, 2002 and did not deserve a "Below Expectation" rating. Consistent with his excellent work record of accomplishment, Plaintiff's work performance for the said period was excellent.

59.     STAVSKY deliberately procured the "Below Expectation" rating so that it would be used as a pretext for the relative low salary increase and bonus Plaintiff received. In preparing Plaintiff's 2002, performance evaluation, STAVSKY inappropriately referred AVOLANTI to SHAUGHNESSY for input with respect to the first eight (8) months of Plaintiff's 2002 performance.

60.     STAVSKY was fully aware that Plaintiff reported to Shaughnessy only from May to August 2002. In keeping with their apparent agenda, STAVSKY and SHAUGHNESSY wrongfully rated Plaintiff's performance "Below Expectation" for the first three quarters of 2002, when in actual fact, Plaintiff reported to SHAUGHNESSY for less than one quarter in 2002.

61.     Plaintiff protested the "Below Expectation" rating and demanded that the same be corrected to reflect his actual performance level.   Defendants revised the entire evaluation and changed Plaintiff's overall performance rating from "Below Expectations" to "Highly Valued".

62.    Despite the change of Plaintiff's performance rating to "Highly Valued" and repeated requests by Plaintiff, U.S. TRUST has failed and/or neglected to increase the salary increase and bonus in question to reflect the "Highly Valued" rating. Unless increased, the low salary increase and bonus will adversely affect the amount of the pension or retirement benefits Plaintiff will be entitled to upon retirement.

63.    Effective January 1, 2004, U.S. TRUST changed its Employees' Retirement Plan to require that benefit earned after 2003 will be calculated using *career average compensation* instead of *final average*. Applying the new rules, benefits earned by Plaintiff prior to 2004 will be calculated based upon the average of *Plaintiff's highest five consecutive years' compensation between 1994 and 2003*. And the benefit Plaintiff earns after 2003 will be based on the average of his compensation received for all years of service with participating companies.

64.    Plaintiff believes that the denial of promotion and discriminatory low salary increases he received over the years negatively affected the *final average compensation* used to calculate his retirement benefit accruals for the period ending December 31, 2003.

65.    The General Ledger part of the Administrative Systems which had operated smoothly when it was managed by Plaintiff developed a problem that caused it to be inoperative for two days. Senior management requested Plaintiff to address the problem. Plaintiff restored the system to be functional. As a result, on or about October 8, 2003, management responsibilities for the Administrative Systems were transferred back to Plaintiff.

66.    Early in 2004, Plaintiff was reassigned to report one level up to VITO (at Reporting Level 2). As that year ended, Plaintiff inquired about title change from VP to SVP, salary increase and bonus. Defendants failed to promote Plaintiff to SVP and in order to continue

18

the stagnation of Plaintiff's career advancement, Defendants reassigned Plaintiff to report one level down to MANVILLE, in effect, demoting Plaintiff to Reporting Level 3.

67.     Prior to the time Plaintiff was reassigned to report to MANVILLE, both Plaintiff and MANVILLE had been reporting to VITO (at Reporting Level 2).  At the time, LARSON had been reporting to MANVILLE at Reporting Level 3. However, upon Plaintiff's demotion to Reporting Level 3, LARSON was promoted to Reporting Level 2 from which Plaintiff was demoted. In effect, Defendants swapped Plaintiff's and LARSON'S positions.

68.     Defendants have failed to provide any reasonable explanation for reassigning Plaintiff to report to MANVILLE, who was a Programmer Trainee at the time when Plaintiff was a Project Manager with U.S. TRUST.  Plaintiff is the only Project Manager who reports to Reporting Level 3.  Every other Project Manager or Senior Project Manager employed in CSD reports directly to a MD (Level 2) or higher.

69.     Despite the fact that Plaintiff's work performance has been excellent all through the years, U.S. TRUST and STAVSKY have deliberately stagnated Plaintiff's career advancement by assigning, re-assigning and/or moving Plaintiff back and forth from Reporting Level 2 to 3 and by constantly changing Plaintiff's direct supervisors.  Plaintiff is still reporting to the same level that he reported to eighteen years ago when he commenced his career with U.S. TRUST.

70.     Defendants' discriminatory and retaliatory treatment of Plaintiff as alleged herein, are based upon a pattern or practice of Defendants and constitute a continuing violation of Plaintiff's civil rights and equal opportunity from 1995 to the present.

## FIRST CAUSE OF ACTION
## TITLE VII AND § 1981 DISCRIMINATION

71.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 70 of this amended Complaint with the same force and effect as if set forth herein.

72.   By the acts and practices described herein, Defendants have discriminated against Plaintiff in the terms and conditions of his employment on the basis of his race in violation of Title VII and § 1981.

73.   In taking the above-described discriminatory actions, Defendants acted with malice and/or reckless indifference to Plaintiff's rights under Title VII and § 1981.

74.   As a result of said Defendant's discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other monetary damages unless and until this Court grants relief.

## SECOND CAUSE OF ACTION
## TITLE VII AND § 1981 RETALIATION

75.   Plaintiff repeats and realleges each and every allegation contained in paragraph 1 through 74 of this amended Complaint with the same force and effect as if fully set forth herein.

76.   In retaliation for Plaintiff's complaints about Defendants' discriminatory acts, Defendants adversely affected Plaintiff's employment.

77.   In taking the above-described retaliatory actions, Defendants acted with malice and reckless indifference to Plaintiff's rights under Title VII and § 1981.

78.   As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other monetary damages unless and until this Court grants relief.

## THIRD CAUSE OF ACTION
## HUMAN RIGHTS LAW AND CITY LAW DISCRIMINATION

79.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 78 of this amended Complaint with the same force and effect as if set forth herein.

80.    By the acts and practices described herein, Defendants have discriminated against Plaintiff in the terms and conditions of his employment on the basis of his race in violation of the Human Rights Law and the City Law.

81.    In taking the above-described discriminatory actions, Defendants acted with malice and/or reckless indifference to Plaintiff's right under the Human Rights Law and the City Law.

82.    As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other monetary damages unless and until this Court grants relief.

## FOURTH CAUSE OF ACTION
## HUMAN RIGHTS LAW AND CITY LAW RETALIATION

83.    Plaintiff repeats and realleges each and every allegation contained in paragraph 1 through 82 of this amended Complaint with the same force and effect as if fully set forth herein.

84.    In retaliation for Plaintiff's complaints about Defendants' discriminatory acts, Defendants adversely affected Plaintiff's employment.

85.    In taking the above-described retaliatory actions, Defendants acted with malice and reckless indifference to Plaintiff's rights under the Human Rights Law and the City Law.

86.    As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other monetary damages unless and until this Court grants relief.

## FIFTH CAUSE OF ACTION
## LAD DISCRIMINATION

87.     Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 86 of this amended Complaint with the same force and effect as if set forth herein.

88.     By the acts and practices described herein, Defendants have discriminated against Plaintiff in the terms and conditions of his employment on the basis of his race in violation of the LAD.

89.     In taking the above-described discriminatory actions, Defendants acted with malice and/or reckless indifference to Plaintiff's right under the LAD.

90.     As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other monetary damages unless and until this Court grants relief.

## SIXTH CAUSE OF ACTION
## LAD RETALIATION

91.     Plaintiff repeats and realleges each and every allegation contained in paragraph 1 through 90 of this amended Complaint with the same force and effect as if fully set forth herein.

92.     In retaliation for Plaintiff's complaints about Defendants' discriminatory acts, Defendants adversely affected Plaintiff's employment.

93.     In taking the above-described retaliatory actions, Defendants acted with malice and reckless indifference to Plaintiff's rights under the LAD.

94.     As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other monetary damages unless and until this Court grants relief.

## VI.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment:

(a)   declaring that the acts and practices complained of herein are in violation of the Title VII, § 1981, the Human Rights Law, the City Law and the LAD;

(b)   enjoining and permanently restraining these violations of Title VII, § 1981, the Human Rights Law, the City Law and LAD;

(c)   directing Defendants to take such action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

(d)   directing Defendants to make him whole for all earnings he would have received but for Defendants' unlawful conduct, including, but not limited to, wages, salary raises, pension, bonuses, and other lost benefits;

(e)   directing Defendants to pay Plaintiff an additional amount as compensatory damages for his pain and suffering;

(g)   directing Defendants to pay Plaintiff an additional amount as punitive damages for their willful and/or reckless disregard for Plaintiff's statutory rights;

(h)   awarding Plaintiff such interest as is allowed by law;

(i)   awarding Plaintiff his reasonable attorneys' fees and costs; and

(j)   granting other such and further relief as this Court deems necessary and proper.

## VII.   DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

23

Dated:          Brooklyn, New York
                February 14, 2006

                        LAW  OFFICE  OF  VINCENT  I.  EKE-NWEKE,
                        P.C.

                        By: _____
                            Vincent I. Eke-Nweke (VE 5282)
                            Attorney for the Plaintiff
                            498 Atlantic Avenue
                            Brooklyn, New York 11217
                            (718) 852-8300

24

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Amended Complaint was served on the attorneys for the defendants herein by depositing a true copy of same enclosed in post-paid properly addressed wrappers, in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York at the following address this 14th day of February, 2006:

Jill L. Rosenberg, Esq.
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, New York 10103-0001

Vincent I. Eke-Nweke